# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

|  |  |  |
|---|---|---|
| JIMMIE BUFORD, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 13 C 176 |
| | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| SALEH OBAISI, LATONYA WILLIAMS, JENNIFER ENCARNARCION and WENDY OLSEN, | ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Jimmie Buford, an Illinois prisoner at Stateville Correctional Center, brings this suit under 42 U.S.C. § 1983 against Stateville Medical Director Dr. Saleh Obaisi[1] for failing to provide adequate medical care for his partially-torn left Achilles tendon in violation of the Eighth Amendment. Buford seeks monetary damages to compensate him for his injuries, as well as an injunction requiring Obaisi to provide him appropriate medical treatment. Obaisi moves for summary judgment. For the following reasons, his Motion for Summary Judgment is now denied. (Dkt. No. 99).

## BACKGROUND

The following facts are undisputed unless otherwise noted. On August 21, 2012, Buford was evaluated by a Registered Nurse around 6:30 p.m. after allegedly injuring his ankle or Achilles tendon on the basketball court. (Def. 56.1, ¶ 10; Pl. 56.1 Resp., ¶ 10). The nurse performed a physical examination and found no swelling, redness, or discoloration to his ankle. (*Id.*) She noted that Buford described his pain as a level two out of ten. (*Id.*) The nurse gave

---

[1] All other defendants originally named in Buford's Second Amended Complaint have been voluntarily dismissed.

1

Buford ice, Tylenol #10 (325 mg), and a crutch for five days in response to his subjective complaints of pain. (Def. 56.1, ¶ 11; Pl. 56.1 Resp., ¶ 11).

The next day, Buford complained to a correctional medical technician ("CMT") that he had snapped his Achilles tendon. (Def. 56.1, ¶ 13; Pl. 56.1 Resp., ¶ 13). The CMT noted that Buford complained of pain in his left ankle, but that there was no swelling and Buford was able to move the ankle. (*Id.*) Buford was transported to the health care unit via wheelchair for further evaluation of his foot-related complaints. (*Id.*) In the health care unit, Obaisi examined Buford and assessed him as having a ruptured Achilles tendon. (Def. 56.1, ¶ 14; Pl. 56.1 Resp., ¶ 14). Obaisi prescribed Buford two crutches, a low bunk and gallery permit, and Naproxen (500 mg) to be taken twice daily for thirty days. (*Id.*)

Five days later, on August 27, 2012, in collegial review with Dr. Baker, Dr. Obaisi secured approval for an MRI of the Plaintiff's left ankle in order to further assess Plaintiff's "ruptured Achilles tendon." (Def. 56.1, ¶ 15; Pl. 56.1 Resp., ¶ 15; Pl. Add'l Facts, ¶ 4; Def. Resp., ¶ 4). The only record of this approval is a doctor's note written by Obaisi. There is no evidence in the record of when that approval was memorialized in an order, whether it was marked urgent, and when efforts to make an appointment for the approved MRI first began.

Wexford policies provide that the appropriate primary response to a ruptured Achilles tendon is "splint, crutches, antibiotics if laceration;" the appropriate secondary response is "refer semi-emergent if lacerations, urgent if ruptured (closed)." (*See* Dkt. No. 104, Ex. C at 4). The secondary response policy also notes that "unless emergent, conduct collegial review." (*See id.*)

The next mention of the MRI in the record appears to be on September 6, 2012, when a PA told Buford that he had been approved for an MRI and that the MRI appointment was pending. (Def. 56.1, ¶ 17; Pl. 56.1 Resp., ¶ 17). On that day, Buford complained to a CMT that

he was in a lot of pain and could not ambulate without crutches. He was subsequently evaluated by a physician's assistant in the health care unit. (Def. 56.1, ¶ 16; Pl. 56.1 Resp., ¶ 16 Pl. Add'l Facts, ¶ 5; Def. Resp., ¶ 5). The PA noted that Buford complained of pain mostly at night and that she had consulted with Obaisi. (*Id.*) The PA made a treatment plan for Buford consisting of a posterior splint, continuing all medications as directed, prescribing Tramadol (50 mg) for 14 days, and continuing all previous orders. (Def. 56.1, ¶ 17; Pl. 56.1 Resp., ¶ 17). The continuation of orders included Obaisi's previous orders, including his prescriptions for two crutches, a low bunk and gallery permit, and Naproxen. (Def. 56.1, ¶ 20; Pl. 56.1 Resp., ¶ 20). It was at this time that she also advised Buford that he had been approved for an MRI and that the MRI appointment was pending. (Def. 56.1, ¶ 17; Pl. 56.1 Resp., ¶ 17). On three other occasions in September and October, 2012, Buford was treated by Obaisi and a PA for various other ailments unrelated to his Achilles tendon. There is no record of Buford making complaints regarding his Achilles tendon at any of those unrelated appointments. (Def. 56.1, ¶ 22; Pl. 56.1 Resp., ¶ 22).

On October 31, 2012, Buford was taken to the University of Illinois Chicago Hospital for an MRI of his Achilles tendon; he did not, however, receive an MRI. (Def. 56.1, ¶ 23; Pl. 56.1 Resp., ¶ 23). When Buford returned to Stateville, he was evaluated by a Registered Nurse who informed him that the MRI appointment was rescheduled for November 16, 2012. (Def. 56.1, ¶ 24; Pl. 56.1 Resp., ¶ 24). The nurse noted that Buford ambulated well with one crutch and that she notified Obaisi, who ordered Motrin (400 mg) for Buford. (*Id.*) That same day, in collegial review, Obaisi again secured approval for Buford's referral for an MRI, this time marking the request as urgent. (Def. 56.1, ¶ 25; Pl. 56.1 Resp., ¶ 25).

Buford was referred less than a week later, on November 5, 2012, to receive an MRI at Provena St. Joseph Medical Center. (Def. 56.1, ¶ 26; Pl. 56.1 Resp., ¶ 26). The MRI results

showed that Buford had a partial longitudinal tear of the Achilles tendon extending the length of the tendon. (Def. 56.1, ¶¶ 28, 30; Pl. 56.1 Resp., ¶¶ 28, 30). The parties agree that longitudinal tears "are the most benign tears, which heal by themselves without surgical intervention." (Def. 56.1, ¶ 31; Pl. 56.1 Resp., ¶ 31). Traverse tears, on the other hand, "are much more concerning as the fibers are cut laterally, causing them to shrink upward." (*Id*.)

On November 9, 2012, Obaisi again evaluated Buford in the health care unit, noting that the MRI showed a partial tear of the left Achilles tendon. (Def. 56.1, ¶ 29; Pl. 56.1 Resp., ¶ 29). Obaisi prescribed Buford with Tylenol with Codeine #3 for two weeks. (*Id*.)

On November 20, 2012, Buford was sent to UIC for follow-up and evaluation of his partially torn Achilles tendon. (Def. 56.1, ¶ 32; Pl. 56.1 Resp., ¶ 32). Buford was evaluated by two orthopedic surgeons who noted that Buford had left foot tenderness to palpation along the Achilles; that he was able to plantarflex; and that his motor strength was three out of five. (Def. 56.1, ¶ 33; Pl. 56.1 Resp., ¶ 33). UIC's recommendation was to "Return to clinic with MRI CD and report," and this recommendation was "Approved" and signed by Obaisi on November 21, 2012. (Pl. Add'l Facts, ¶ 12; Def. Resp., ¶ 12). A return visit to UIC was not scheduled until March 2013.

During an examination of his eye by a Registered Nurse on December 21, 2012, the nurse noted no signs of distress, but that Buford stated, "Say my leg is killing me." (Pl. Add'l Facts, ¶ 19; Def. Resp., ¶ 19). The note reads:

> S: "Say my leg is killing me."
> O: I/M A3 0x3. Walks with one crutch. Ø signs of distress at this time. I/M went to UIC for eye doctor. Dr. Obaisi notified.
> A. WRIT Return

(Dkt. No. 104, Ex. A at 2). In addition, Buford's medical records contain two letters addressed to Obaisi, one of which is dated December 23, 2012, complaining of pain and stating he had

4

stopped receiving pain medication. (Pl. Add'l Facts, ¶ 20; Def. Resp., ¶ 20). Obaisi testified that he has no role in evaluating such letters from inmates and had not seen the letter before. (Pl. Add'l Facts, ¶ 21; Def. Resp., ¶ 21). There is no evidence Obaisi received these letters, but they were contained in Buford's medical records.

On January 25, 2013, Buford was evaluated by a CMT and he complained that his Achilles tendon pain was beginning to increase. (Def. 56.1, ¶ 34; Pl. 56.1 Resp., ¶ 34). Buford was scheduled for evaluation in the health care unit on February 21, 2013, but was not seen due to a lockdown. (Def. 56.1, ¶ 36; Pl. 56.1 Resp., ¶ 36). It is undisputed that, during lockdowns, inmates cannot be brought to the health care unit or urgent care unless there is a life-threatening situation. (Def. 56.1, ¶ 37; Pl. 56.1 Resp., ¶ 37).

On February 27, 2013, Obaisi completed a follow-up examination on Buford's Achilles tendon and found that the tendon was able to be palpated and that Buford was able to walk on his heel and stand up on his tip toes. (Def. 56.1, ¶ 39; Pl. 56.1 Resp., ¶ 39). Obaisi ordered a follow-up examination in two weeks and provided Buford a steroid injection to the lower end of his Achilles tendon. (Def. 56.1, ¶ 40; Pl. 56.1 Resp., ¶ 40).

At a follow-up visit on March 13, 2013, Buford told Obaisi that the steroid injection helped alleviate pain but that he was still experiencing some pain. (Def. 56.1, ¶ 44; Pl. 56.1 Resp., ¶ 44). Obaisi prescribed Buford with Neurontin (300 mg) for six months to address his complaints of headaches and noted that he would have another collegial review to refer Buford to UIC for further evaluation. (*Id.*) Two days later, in collegial review with Dr. Haymes, Obaisi secured approval for Buford to be referred to UIC for further evaluation. (Def. 56.1, ¶ 45; Pl. 56.1 Resp., ¶ 45). On May 10, 2013, he was treated by the physician's assistant at Stateville for

complaints of abdominal discomfort, but there are no documented complaints of Achilles tendon pain during this visit. (Def. 56.1, ¶ 46; Pl. 56.1 Resp., ¶ 46).

On June 18, 2013, Buford was sent to UIC for follow-up and evaluation of his partially torn Achilles tendon. (Def. 56.1, ¶ 47; Pl. 56.1 Resp., ¶ 47). Buford was evaluated by two orthopedic surgeons, Dr. League and Dr. Wang. (Def. 56.1, ¶ 48; Pl. 56.1 Resp., ¶ 48). League found Buford to have a good range of motion with ankle dorsiflexion and plantarflexion; and that his strength was four out of five. (*Id.*) League and Wang informed Buford that it was a partial tear and that surgery was not needed. (Def. 56.1, ¶ 49-50; Pl. 56.1 Resp., ¶ 49-50). The doctors also recommended "conservative therapy, including aggressive physical therapy." (Pl. Add'l Facts, ¶ 13; Def. Resp., ¶ 13). Upon his return from UIC, Buford reported to a registered nurse that he felt fine, but that his foot was a little sore. (Def. 56.1, ¶ 51; Pl. 56.1 Resp., ¶ 51).

On June 20, 2013, Obaisi signed a Medical Special Services Referral and Report wherein Dr. Wang recommended physical therapy for Buford's Achilles tendon twice a week for six weeks. (Pl. Add'l Facts, ¶ 14; Def. Resp., ¶ 14). The referral was marked as urgent. (Dkt. No. 104, Ex. A at 6). The bottom of the form contained a statement that read "I have read the recommendations and" either (1) Approve or (2) Deny or revise as indicated on the Notification of Medical Service Referral Denial or Revision, DOC 0255. (Dkt. No. 104, Ex. A at 6; Pl. Add'l Facts, ¶ 14; Def. Resp., ¶ 14). Obaisi signed the form, but failed to check a box either approving or denying/revising the recommendation for physical therapy. (Dkt. No. 104, Ex. A at 6; Pl. Add'l Facts, ¶ 14; Def. Resp., ¶ 14). There are no records of Buford having seen a physical therapist between June 18, 2013 and March 18, 2014; Buford testified he had not seen a physical therapist and Obaisi testified he likely had not. (Pl. Add'l Facts, ¶ 15-16; Def. Resp., ¶ 15-16).

Obaisi could not recall why he did not recommend physical therapy in this case. (Pl. Add'l Facts, ¶ 18; Def. Resp., ¶ 18).

On July 30, 2013, Buford was evaluated by a registered nurse regarding his Achilles tendon and the nurse instructed him to elevate and rest his foot and continue his current medications. (Def. 56.1, ¶ 52; Pl. 56.1 Resp., ¶ 52). He was evaluated in the health care unit on September 5, 2013 for unrelated issues and, again, no complaints regarding the Achilles tendon injury were noted. (Def. 56.1, ¶ 53; Pl. 56.1 Resp., ¶ 53). He was prescribed Motrin (400 mg) for 14 days due to his other complaints. (*Id.*)

On September 16, 2013, Obaisi evaluated Buford regarding his Achilles tendon and noted that the left heel condition was stable and scheduled Buford for further evaluation and follow-up. (Def. 56.1, ¶ 54; Pl. 56.1 Resp., ¶ 54). Buford was seen by Obaisi and a CMT on at least three other occasions for other issues during October and November 2013 and there are no notes of complaints regarding his Achilles tendon from those visits. (Def. 56.1, ¶ 55-57; Pl. 56.1 Resp., ¶ 55-57). He was prescribed Mobic (7.5 mg) for ninety days on October 30, 2013 for shoulder pain. (Def. 56.1, ¶ 55; Pl. 56.1 Resp., ¶ 55). On February 11, 2014, Obaisi saw Buford for eye-related issues. (Def. 56.1, ¶ 59; Pl. 56.1 Resp., ¶ 59). During that visit, Obaisi and Buford discussed the partial tear to his Achilles tendon and Obaisi ordered a follow-up in four weeks, noting he would be considering further referral to an outside orthopedic clinic. (*Id.*)

Buford was scheduled for a follow-up visit on March 12, 2014, but was not seen because the facility was on lockdown. (Def. 56.1, ¶ 61; Pl. 56.1 Resp., ¶ 61). On March 18, 2014, Buford was referred out to UIC's Orthopedic Clinic for further evaluation by Dr. League. (Def. 56.1, ¶ 62; Pl. 56.1 Resp., ¶ 62). Buford told League that he had been doing physical therapy on his own and was experiencing stiffness around his ankle. (*Id.*) Buford had no pain on palpitation along

7

the left Achilles tendon and his muscle strength was five out of five for all lower-extremity muscle groups, bilaterally. (*Id.*) League encouraged Buford to do self-range of motion and strengthening exercises and prescribed physical therapy for gait and proprioception training and strengthening. (*Id.*) Obaisi ordered the same. (Def. 56.1, ¶ 63; Pl. 56.1 Resp., ¶ 63). Buford testified that no medical provider at UIC ever told him that he needed surgery for his Achilles tendon injury. (Def. 56.1, ¶ 70; Pl. 56.1 Resp., ¶ 70). On May 13, 2014, Buford was evaluated by a physical therapist who performed a full evaluation of him and noted that Buford was "continuing to complain of pain in weight bearing activities" and that there was mild thickening and atrophy associated with Buford's left ankle. (Def. 56.1, ¶ 64; Pl. 56.1 Resp., ¶ 64; Pl. Add'l Facts, ¶ 28; Def. Resp., ¶ 28). The physical therapist also found that Buford's range of motion on the right was 18 degrees and on the left was 15 degrees and that his passive range of motion was completely within normal limits. (Def. 56.1, ¶ 65; Pl. 56.1 Resp., ¶ 65). Obaisi testified that he will continue to treat Buford for his medical needs, but that his left Achilles tendon is now fully healed. (Dkt. No. 101, Ex. D at 48). He testified that he believed Buford was fully healed at the end of 2013 and 2014 based on his clinical exam of Buford showing he had muscle strength of five out of five. (*Id.*)

## DISCUSSION

Summary judgment is proper where, "viewing all facts and inferences in favor of the nonmoving party, no genuine dispute as to material fact exists, and the moving party is entitled to judgment as a matter of law." *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). The court's function is not to weigh the evidence but merely to determine if "there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Summary judgment is appropriate where the moving party shows that the nonmoving party cannot prove an element

essential to its case. *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012). Where the moving party has properly supported its motion, the nonmoving party must come forward with facts that show there is a genuine issue for trial. *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 951 (7th Cir. 2013).

Obaisi moves for summary judgment on the ground that Buford has "failed to show [Obaisi was] deliberately indifferent to his serious medical needs and, further, that Plaintiff has failed to show he is entitled to injunctive relief." (*See* Dkt. No. 99, 2). To sustain a § 1983 claim against a defendant in his individual capacities, plaintiff must be able to establish: (1) that he had an objectively serious medical condition; (2) that the defendant acted with deliberate indifference to that condition; and (3) that the defendant's indifference caused him an injury. *See Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). Obaisi does not dispute that Buford's medical condition was objectively serious, *see* Dkt. No. 100, 3; he argues only that he was not deliberately indifferent toward that condition by, as Buford argues, delaying Buford physical therapy or pain medications.

A defendant acts with deliberate indifference where he both (1) had actual, subjective knowledge of the risk to the inmate's health, and (2) disregarded that risk. *Id*. An official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. (quoting *Higgins v. Corr. Med. Serv. of Ill., Inc.*, 178 F.3d 508, 510 (7th Cir. 1999)). Neither negligence nor medical malpractice gives rise to a constitutional violation. *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.") (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). However, "[i]f a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer

that a prison official knew about it and disregarded it." *See Petties v. Carter*, Case No. 14-2674, slip op. at 8 (7th Cir. Aug. 25, 2016).

"One hint of such departure is when a doctor refuses to take instructions from a specialist. Another is when he or she fails to follow existing protocol." *See id*. at 9 (internal citations omitted). Other evidence that can support an inference of deliberate indifference is "an inexplicable delay in treatment which serves no penological interest." *See id*. at 10. "To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain." *See id*. at 11.

In this case, questions of fact remain regarding whether Obaisi was deliberately indifferent in his inconsistent prescription of pain medications and delay in ordering Buford's physical therapy. Buford was provided various pain medications in the initial weeks following his initial Achilles tendon injury on August 21, 2012. That day, a nurse provided Buford with Tylenol #10 (325 mg); the next day, Obaisi prescribed him Naproxen (500 mg) to be taken twice daily for thirty days; on September 6, 2012, a PA made a treatment plan for Buford that included prescribing Tramadol (50 mg) for 14 days, as well as continuation of the Naproxen; on October 31, 2012, Obaisi ordered Buford Motrin (400 mg); and, on November 9, 2012, Obaisi prescribed Buford with Tylenol with Codeine #3 for two weeks. Then, the medication stopped.

During an examination of Buford's eye by a Registered Nurse on December 21, 2012, the nurse noted no signs of distress, but that Buford stated, "Say my leg is killing me." In addition, Buford's medical records contain two letters addressed to Obaisi, one of which is dated December 23, 2012, complaining of pain and stating he had stopped receiving pain medication.

Despite Buford's continuing complaints of pain, he did not receive additional pain medication until February 27, 2013 when Obaisi provided him a steroid injection.

The record does not reflect a reason for the gap in pain medication and a reasonable jury could conclude that Obaisi was deliberately indifferent to the unnecessary pain that the gap caused. This is true even if the gap in treatment did not exacerbate Buford's injury or diminish his chances of a full recovery. *See Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011) ("A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain."); *Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) ("A jury could infer that [Defendant's] delay caused [Plaintiff] that many more hours of needless suffering for no reason. That is enough to survive summary judgment."); *Walker v. Benjamin*, 293 F.3d 1030, 1040 (7th Cir. 2002) (summary judgment not appropriate where prison nurse refused to administer pain medication prescribed by a physician).

A material factual dispute similarly exists as to whether Obaisi was deliberately indifferent in delaying an order for physical therapy after such treatment was ordered by two orthopedic surgeons from UIC. On June 18, 2013, Buford was sent to UIC for follow-up and evaluation of his Achilles tendon. Buford was evaluated by two orthopedic surgeons, Dr. League and Dr. Wang who informed Buford that it was a partial tear and that surgery was not needed. The doctors recommended, however, "conservative therapy, including aggressive physical therapy."

On June 20, 2013, Obaisi signed a Medical Special Services Referral and Report wherein Dr. Wang recommended physical therapy for Buford's Achilles tendon twice a week for six weeks. The referral was marked as urgent. The bottom of the form contained a statement that

11

read "I have read the recommendations and" either (1) Approve or (2) Deny or revise as indicated on the Notification of Medical Service Referral Denial or Revision, DOC 0255. Obaisi signed the form, but failed to check a box either approving or denying/revising the recommendation for physical therapy. There are no records of Buford having seen a physical therapist between June 18, 2013 and May 13, 2014 when he was finally evaluated by a physical therapist. Buford testified he had not seen a physical therapist during that interim and Obaisi testified he likely had not. Obaisi could not recall why he did not recommend physical therapy for Buford.

Obaisi testified that he always follows the recommendations of specialists, that Buford's specialists recommended physical therapy, and that he did not order physical therapy for Buford. Obaisi provided no rationale for failing to order physical therapy until over a year after it was recommended and "[a]t the very least, [Buford] has the right for a jury to hear Dr. Obaisi's justifications for his treatment decisions (or lack thereof) and to determine if Dr. Obaisi was deliberately indifferent, rather than simply incompetent, in treating his injury." *See Petties*, slip op. at 17-18. Buford was not seeking unconventional treatment; he sought medication that would reduce his pain and physical therapy to treat his Achilles tendon tear. "Although an inmate is not entitled to demand specific care and is not entitled to the best care possible, he is entitled to reasonable measures to meet a substantial risk of serious harm." *See Arnett*, 658 F.3d at 753-54. Summary judgment is denied based on these outstanding issues of material fact.

Lastly, the Court denies summary judgment with respect to Buford's claim for injunctive relief. Injunctive relief "is only proper if there is a continuing violation of federal law." *Kress v. CCA of Tenn., LLC*, 694 F.3d 890, 894 (7th Cir. 2012); *see also Al-Alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir. 1991). On May 13, 2014, Buford was evaluated by a physical therapist that

performed a full evaluation of him and noted that Buford was "continuing to complain of pain in weight bearing activities" and that there was mild thickening and atrophy associated with Buford's left ankle. The physical therapist also found that Buford's range of motion on the right was 18 degrees and on the left was 15 degrees and that his passive range of motion was completely within normal limits. There are no records of physical therapy or other treatment of Buford's Achilles tendon subsequent to that May 13, 2014 evaluation.

Obaisi testified that Buford's Achilles tendon issue is resolved, but Buford testified that he continues to walk with a limp and suffers from unresolved pain in his left Achilles tendon and has filed numerous grievances regarding the same. This is consistent with the physical therapist's note from May 13, 2014 indicating Buford's complaints of ongoing pain. It is possible that Obaisi has properly concluded treatment of Buford's Achilles tendon injury, but that is not for this Court to determine at the summary judgment stage. *See Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000) (finding that a district court erred in granting summary judgment for Defendants when it ruled that Defendants "'did not simply ignore Sherrod' because he 'received continuous medical treatment by Defendants'" since "a prisoner is not required to show that he was literally ignored by the staff").

## **CONCLUSION**

For the reasons stated, Dr. Saleh Obaisi's Motion for Summary Judgment [99] is denied.

Date: _9/6/2016_____      _____
                              Virginia M. Kendall
                              United States District Court Judge
                              Northern District of Illinois

13